**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| In re:<br><br>Charles Pappas,<br><br>　　　　　　Debtor | Chapter 13<br>Case No. 18-20179 |

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT**
**AND ADJUDICATING UNDISPUTED FACTS**

Charles Pappas, the debtor, and Donna Parris, a creditor, have been embroiled in litigation for many years now. Their most recent skirmish arises out of Mr. Pappas's effort to obtain confirmation of a chapter 13 plan. Ms. Parris has moved for summary judgment, asking the Court to deny confirmation based on an asserted lack of good faith, as to both the petition and the plan. Although Ms. Parris's motion raises legitimate concerns, the summary judgment record does not establish the absence of disputed material facts or her entitlement to judgment as a matter of law. For this reason, Ms. Parris's motion must be denied.

I.　LEGAL FRAMEWORK

Summary judgment is properly granted only if Ms. Parris shows that there is no genuine dispute as to any material fact and that she is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the movant, Ms. Parris bears the initial burden of producing evidence in support of her motion. *See* Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000). Here, where Ms. Parris would not bear the ultimate burden of persuasion at trial, *see* In re Bradley, 567 B.R. 231, 236 (Bankr. D. Me. 2017), she can meet her initial burden by producing evidence that negates one of the requirements of confirmation, or by pointing to evidence demonstrating that Mr. Pappas would be unable to meet his burden of persuasion at trial, *see* Carmona, 215 F.3d at 132. If Ms. Parris meets her initial burden, then Mr. Pappas can defeat her motion by

establishing that a trier of fact could reasonably find in his favor with respect to the challenged aspects of confirmation. See Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 158 (1st Cir. 1998).

Ms. Parris challenges only two of the requirements for confirmation of a chapter 13 plan—good faith in the proposal of the plan under 11 U.S.C. § 1325(a)(3) and good faith in the filing of the petition under 11 U.S.C. § 1325(a)(7). The concept of "good faith" is not defined by the Bankruptcy Code, "and the legislative history provides little insight into its meaning." Berliner v. Pappalardo (In re Puffer), 674 F.3d 78, 81 (1st Cir. 2012). Determinations of good faith under section 1325 are based on the totality of the circumstances. Id. at 82. "These questions of good faith are inherently factual questions, not capable of any bright-line test or formulation[,]" and "the factors considered may vary from case to case." In re Bradley, 567 B.R. at 236. "The ultimate inquiry is whether the debtor is attempting to thwart his creditors, or is making an honest effort to repay them to the best of his ability." Id. (quotation marks omitted).

## II. SUMMARY JUDGMENT METHODOLOGY AND FACTS

With her motion, Ms. Parris submitted a statement of material facts, most of which were appropriately supported by specific citations to the record. See D. Me. LR 56(b), (f). Many of the facts asserted by Ms. Parris are undisputed because Mr. Pappas expressly admitted them or failed to controvert them. See Fed. R. Civ. P. 56(e)(2); D. Me. LR 56(f). With his opposition to the motion, Mr. Pappas submitted additional facts, supported only by his one-page affidavit. See D. Me. LR 56(c). In his opposition, Mr. Pappas also denied certain facts asserted by Ms. Parris, claiming that she did not provide appropriate record citations for them. In her reply, Ms. Parris provided supporting citations for some of those facts. The Court has considered these additional citations under Fed. R. Civ. P. 56(e)(1), and the facts supported by the additional citations are deemed admitted because Ms. Parris overcame the only attempt to controvert them.

The following undisputed facts are established by (i) the parties' statements of material facts and the cited portions of the record, and (ii) the schedules, statements, plan, and other items on the docket and the claims register. Certain facts, although not included in the statements of material facts, are included here as the only reasonable inferences that can be drawn from the undisputed facts and the specific portions of the record cited by the parties. The Court adjudicates these facts, under Fed. R. Civ. P. 56(g), to narrow the scope of the issues in this contested matter. These facts will be treated as established unless this order is modified before the entry of final judgment. *See* Latin Am. Music Co. v. Media Power Grp., Inc., 705 F.3d 34, 40-41 (1st Cir. 2013).

1. Ms. Parris lived in a mobile home park owned by limited liability companies of which Mr. Pappas was a member.

2. The lengthy history of litigation between Mr. Pappas and Ms. Parris arose, in the first instance, out of incidents at the mobile home park.

3. In January 2012, Ms. Parris was awarded $262,407 in damages in a civil rights action against Mr. Pappas in the United States District Court for the District of Connecticut (the "Connecticut District Court").[1]

4. Several months later, the Connecticut District Court granted Ms. Parris's request for sanctions against Mr. Pappas—while leaving the nature of the sanction open—based on his sale of real estate in violation of a preliminary injunction.

5. In August 2012, the Connecticut District Court imposed discovery sanctions on Mr. Pappas, ordering him to: (1) produce outstanding discovery; (2) freeze all bank account activity other than for payment of certain expenses; and (3) tender to Ms. Parris the contents of all bank accounts not previously disclosed.

6. The court also awarded Ms. Parris attorney fees and set the matter for an evidentiary hearing.

7. Before that hearing took place, Mr. Pappas filed a chapter 7 petition in the United States Bankruptcy Court for the District of Connecticut (the "Connecticut Bankruptcy Court").

---

[1] Neither this fact nor the preceding fact was included in the parties' statements of material facts. However, Ms. Parris expressly incorporated the exhibits filed with her summary judgment motion in a related adversary proceeding into this record, and Mr. Pappas admitted that those exhibits constituted the background of the judgments against him.

8. In January 2014, the Connecticut Bankruptcy Court entered an order granting, in part, Ms. Parris's motion for sanctions related to Mr. Pappas's collection of rents payable to his limited liability companies.

9. The following month, the Connecticut Bankruptcy Court entered a second sanctions order against Mr. Pappas based, in part, on his failure to appear for a deposition or respond to a subpoena.

10. In January 2016, the Connecticut District Court imposed sanctions on Mr. Pappas for concealing the sale of real property and failing to (i) make financial disclosures, and (ii) account for the rents from the mobile home park.

11. As a sanction, the Connecticut District Court directed Mr. Pappas to make broad disclosures and to tender $47,844 to Ms. Parris by February 19, 2016.

12. In February 2016, the Connecticut District Court held a hearing on Mr. Pappas's failure to comply with the January 2016 sanctions order.

13. When Mr. Pappas failed to appear for the hearing, the Connecticut District Court ordered him to appear for a later trial on sanctions, issued a writ for his arrest, and appointed a federal public defender for him.

14. In September 2016, Mr. Pappas stated, in response to an interrogatory, that he "has not opened or maintained any bank account, directly or indirectly, since August of 2012."

15. Two months later, Mr. Pappas's public defender provided an update to that interrogatory response, disclosing that Mr. Pappas maintained a bank account with a negative balance.

16. Mr. Pappas later testified that he had lied about the existence of the bank account because he "didn't think it was anybody's business."

17. In October 2017, the Connecticut District Court issued a finding of contempt and a ruling on Ms. Parris's renewed motion for sanctions.

18. In its contempt order, the court found that Mr. Pappas had "constructed a lifestyle in which he shows no income, property, or assets."

19. The court stated that:

> [Ms. Parris] has uncovered a troubling record of [Mr.] Pappas's close associations with Trusts in which his girlfriends or, temporarily, his sister, nominally act as Trustee. [Mr. Pappas] has demonstrated that he is not incentivized to show income. He testified to generating undisclosed, unverifiable, income from wood sales, a Radon company, construction, rental income and handyman type work without explaining how he houses, clothes, feeds and supports himself.

20. The court found that Mr. Pappas had "offered no testimony or evidence to support a finding that he 'made diligent efforts' to comply with [the January 2016 sanctions order] or that 'circumstances have changed,' making compliance with that order impossible."

21. The court also found that, between the January 2016 sanctions order and the contempt hearing in August 2017, Mr. Pappas made a single payment to Ms. Parris in the amount of $42.

22. Based on these findings, the court ordered Mr. Pappas to pay $800 per month to Ms. Parris to purge his contempt.

23. Mr. Pappas filed a motion to reconsider or modify the October 2017 contempt order, asking the court to reduce the required payments to $334 per month.

24. About six months later, on April 3, 2018, Mr. Pappas started this chapter 13 case.

25. On Schedule A/B, he listed a checking account at Key Bank with a balance of $5 and other items of personal property and financial assets totaling $1,350.

26. On Schedule D, he listed the IRS as a creditor with a secured claim of $1,355.

27. Schedule E/F disclosed credit card debts in the amount of $1,767, a tax debt of $34,232, a debt of $80,000 to Ms. Parris, and another unsecured debt of $3,000.

28. Schedule I states that Mr. Pappas has been employed as a maintenance worker at a restaurant since February 2018, with monthly after-tax income of $1,335.

29. Schedule J indicates that Mr. Pappas's monthly expenses consist of $500 for rental or homeownership expenses, $125 for utilities, $300 for food, $100 for transportation, $40 for clothing, $40 for personal care, $40 for medical and dental expenses, and $40 for entertainment, leaving him with monthly net income of $150.

30. On his Statement of Financial Affairs ("SOFA"), Mr. Pappas listed gross income of $2,250 from January 1, 2018 until April 3, 2018, gross income of $12,000 in 2017, and gross income of $9,500 in 2016.

31. When asked whether he had recently been a party to any suits or proceedings, he identified the action between him and Ms. Parris and a proceeding brought by the IRS.

32. When asked whether he owned or had connections with any business within 4 years before the petition date, he answered no.

33. In March 2019, Mr. Pappas amended his SOFA to disclose that he owned or had connections with three businesses: (1) a firewood business named Campfire in a Bag, (2) another firewood business called Roxbury Forest Products, and (3) a trailer park called Normandy's Park.

34. He disclosed that Normandy's Park existed from 2010 to 2018 and described the operating dates of the other businesses with question marks.

35. Mr. Pappas also amended his Schedule E/F to disclose two additional unsecured debts totaling $5,000.

36. Later that month, Mr. Pappas again amended his SOFA to clarify that he owned or was otherwise connected with: (1) a firewood business named Roxbury Forest Products d/b/a Campfire in a Bag, in existence from 2012-2016, and (2) a trailer park called AnnaAlexis LLC d/b/a Normandy's Park, in existence from 2010 to 2017.

37. In his plan, Mr. Pappas proposes to make payments of $150 per month for 36 months for a total "base" of $5,400.

38. The plan contemplates payment of $1,372 in satisfaction of the IRS's secured claim, payment of $540 for chapter 13 trustee's fees, and payment of $3,000 to Mr. Pappas's counsel, leaving $488 for pro rata distribution to unsecured creditors.

39. The filed proofs of claim in this case consist of: (1) a claim of $35,070 filed by the IRS with a secured component of $1,355; (2) two claims for unsecured credit card debt totaling $1,844; and (3) Ms. Parris's unsecured claim in the amount of $120,979.

40. In April 2019, this Court determined that Mr. Pappas's debt to Ms. Parris is non-dischargeable under 11 U.S.C. § 1328(a)(4).

41. Mr. Pappas's schedules and statements do not disclose any interest in a trust known as the Roxbury Road Trust (the "Trust").

42. The original trustee and beneficiary of the Trust was Steven Galner, a friend of Mr. Pappas.

43. In August 2012, the Trust bought real estate in Rumford, Maine for a reported purchase price of $13,500.

44. Two months later, the Trust purchased real estate in Roxbury, Maine for a reported purchase price of $14,000.

45. In the deed for the Rumford property, the Trust address was listed as 123 Wyman Hill Road in Andover, Maine.

46. Mr. Pappas and Laurie Farrington were in a relationship and lived together, for some time, at 123 Wyman Hill Road in Andover.

47. For a time, Ms. Farrington served as trustee of the Trust.

48. When Ms. Farrington resigned from the Trust, she appointed Mr. Pappas's sister, Patricia Hogan, as successor trustee.

49. Later, Julie Webber became trustee of the Trust.

50. Ms. Webber has been in a relationship with Mr. Pappas since 2014 or 2015.

51. Mr. Pappas and Ms. Webber became involved in operating a wood-bundling business on the land in Roxbury.

52. In 2014, Mr. Pappas created a website for a wood-bundling business bearing his name, phone number, and email address.

53. At some point between March 2016 and the present, Mr. Pappas replaced his name on the website with "Julie" and added "Woman owned Business" to the text; the email for the wood-bundling business remains the same, and the phone number for the business continues to ring at Mr. Pappas's residence and forward to his cell phone.

54. Mr. Pappas and Ms. Webber also built two cabins and a restaurant on the land in Roxbury.

55. The first cabin was substantially constructed by the fall of 2014.

56. The materials for each of the cabins cost about $60,000.

57. In September 2015, while Ms. Webber was trustee, the Trust sold the property in Rumford to Mr. Galner for a reported purchase price of $12,000.

58. Mr. Galner did not provide a down payment or a deposit for the Rumford property.

59. After Mr. Galner's death in 2017, his brother asked Mr. Pappas to arrange for the transfer of the Rumford property "back" to Ms. Webber.

60. The Rumford property was ultimately transferred to new owners who executed a note in favor of the Trust for $60,000.

61. The note was secured by a mortgage on the Rumford property.

62. During the August 2017 contempt hearing in Connecticut, Mr. Pappas testified that he did not know of any trusts of which Ms. Webber was the trustee other than the "Farmer's Hill Trust."

63. When asked if Ms. Webber owned the land in Roxbury through a trust, he said, "I believe she did."

64. The following colloquy then ensued:

> Q: Do you know anything about how she came to purchase the property?
> A: Not really.
> Q: Do you know when she bought it?
> A: No. Well, I don't know when, no.
> Q: Do you know what the name of the trust is that she used to own that property?
> A: I can't remember what name she used.

65. When Mr. Pappas was asked whether Ms. Webber owned any property in Rumford, the following conversation took place:

> A: "Yeah, yeah. Julie had a place down there. I don't remember what the address was. She had a place that's been sold a long time ago.
> Q: Do you know what street it was on?
> A: I think it was Pine Street.
> Q: And that was a property that Julie owned?
> A: Yes.
> Q: Did you have anything to do with the purchase of that property?
> A: No.
> Q: Did you have anything to do with it before she owned it?
> A: No.

66. When Mr. Pappas was asked about the deed transferring the Rumford property to the Trust, the following colloquy ensued:

> Q: And it looks like this is a sale document of the property to Laurie Farrington as trustee and the Roxbury Road Trust; is that right?
> A: That's right.
> Q: And at the time the mailing address listed is 123 Wyman Hill Road, Andover, Maine. Is that the property where you lived with Ms. Farrington?
> A: Yes.
> Q: And this is dated in August of 2012?
> A: Yes.
> Q: Is that around the time you were dating Ms. Farrington?
> A: I can't recall.
> Q: Does that jog your memory at all about the Roxbury Road Trust?
> A: Nope.
> Q: Were you involved with Ms. Farrington in setting up that trust?
> A: Nope.
> Q: Did you direct her in any activities of that trust?
> A: No, I did not.
> Q: Do you know who any of the other trustees were of that trust?
> A: No, I can't recall.

67. Mr. Pappas was handed a copy of the deed transferring the Rumford property from the Trust to Mr. Galner, and was asked:

    > Q: What else do you know about the Roxbury Road Trust, sir?
    > A: Nothing.
    > Q: Nothing?  Nothing at all?
    > A: Nothing at all.

68. Mr. Pappas was later confronted with Ms. Farrington's written resignation from the Trust, which he had signed as a witness.

69. In response, he testified that Ms. Farrington had named his sister, Ms. Hogan, as trustee "[b]ecause Julie Webber wanted her to."

70. In his deposition in this case, when Mr. Pappas was asked about the trustee prior to Ms. Webber, he stated:

    > A: That was my sister.
    > Q: How did that come about?
    > A: Because Laurie Farrington was the first trustee and she didn't want to do it anymore and Steven was the only person, and I didn't want liability, so the only other person that we knew at the time was my girlfriend, so that's how it all started.
    > Q: When you said you didn't want liability, what do you mean by that?
    > A: I didn't want anything in my name.  I don't want nothing in my name. I don't want to own anything so – I had tax liability from the IRS as well.
    > Q: So you didn't want anything in your name because of judgments and --
    > A: Yes.
    > Q: -- tax liabilities?
    > A: That's correct.

71. In December 2018, Mr. Pappas compiled and mailed discovery responses, including the Trust Agreement, to Ms. Parris's counsel.

72. This was the first time the Trust Agreement had ever been disclosed in any of the litigation between Mr. Pappas and Ms. Parris.

73. Although the signature page of the Trust Agreement is dated April 2015, the first page of the Agreement states that the Trust was formed in August 2012.

74. At her deposition in February 2019, Ms. Webber stated that she had never seen the Trust Agreement before.

75. She later testified that she signed the Trust Agreement in 2018, at Mr. Pappas's request and in his presence.

76. She also stated that, when she signed it, the Trust Agreement lacked the signature of Steven Galner, who died in 2017.

77. The record reveals that Ms. Webber does not have a full understanding of her relationship to the Trust or its assets.

78. In Mr. Pappas's prior chapter 7 case in the District of Connecticut, he disclosed, on his schedules, an interest in the house he lives in under a land installment contract.

79. In this case, Mr. Pappas's schedules did not disclose any interest in a residence.

80. The deadline for completing discovery was extended multiple times in this matter based on Ms. Parris's uncontested allegations that Mr. Pappas and his counsel were dragging their feet in the discovery process.

81. After Mr. Pappas failed to properly respond to Ms. Parris's discovery requests, the Court entered an order granting Ms. Parris's motion to compel discovery.

82. Later, after Mr. Pappas failed to follow an order establishing procedures for asserting claims of attorney-client privilege with respect to certain emails, the Court granted Ms. Parris's motion for sanctions and deemed the privilege waived.

### III. ANALYSIS

The record reveals a number of factual questions germane to Mr. Pappas's good faith, including whether he funded the Trust, whether he received unverifiable financial benefits from the Trust's properties and operations, whether he lied about his involvement with the Trust, and whether he has continued a pattern of obfuscation in this case. On the ultimate issue of Mr. Pappas's bona fides in filing this case and proposing a plan, the undisputed facts in the summary judgment record do not compel the conclusion that Mr. Pappas lacked good faith. *See* Griggs-Ryan v. Smith, 904 F.2d 112, 116 (1st Cir. 1990) (explaining that where an elusive concept like intent is at issue, summary judgment may be granted when "only a single conclusion is plausibly inferable from the uncontradicted facts"). And, there are genuinely disputed issues of fact that could affect the outcome at trial. For this reason, summary judgment is not appropriate. *See* Pérez–Cordero v. Wal-Mart P.R., Inc., 656 F.3d 19, 25 (1st Cir. 2011) (indicating that summary judgment is inappropriate if the record reveals genuine issues of material fact).

The record does not reveal where the Trust acquired the funds to purchase the properties in Rumford and Roxbury. Ms. Parris would like the Court to believe that Mr. Pappas funded the Trust to shield his assets from creditors, and then lied about it. That theory could find some support in the record. When Ms. Parris's counsel has asked Mr. Pappas about the Trust, his responses have been cagey. He has provided inconsistent explanations about his knowledge of the Trust and its various trustees, all of whom have been closely related to him. That testimony generates a suspicion that he may have been attempting to mislead Ms. Parris about his role in the Trust. The Trust's acquisition of the properties in Rumford and Roxbury also appears suspicious in light of the contemporaneous sanctions and bankruptcy proceedings in Connecticut. This suspicious timing, when coupled with Mr. Pappas's evasive testimony, could support a reasonable inference that Mr. Pappas lied about the Trust to obtain some financial benefit.

Mr. Pappas attests that he has not lied about the Trust, that he did not create the Trust, and that Mr. Galner funded the Trust.[2] Ms. Parris denies these statements, pointing to, among other things, Ms. Webber's testimony where she (i) assumes that Mr. Pappas created the Trust, (ii) says that she signed the Trust Agreement at Mr. Pappas's request and in his presence, (iii) assumes that the other signature on the Agreement is Mr. Galner's, and (iv) states that that Mr. Galner's signature was not on the Agreement when she signed it in 2018, after Mr. Galner's

---

[2] In support of his opposition to the motion, Mr. Pappas avers that he never lied about his involvement with the Trust. Ms. Parris argues that Mr. Pappas did lie, and that his prior deposition testimony clearly shows that he lied. In that deposition, Mr. Pappas disavowed any knowledge of the Trust or its trustees until confronted with his own signature on a Trust-related document, and then admitted that he had some knowledge of the Trust and its trustees. Although Mr. Pappas has failed to provide any explanation for the about-face, the record does not *compel* the conclusion that he was making false statements about the Trust with the intent to deceive Ms. Parris. Given the passage of time, and the Trust's seemingly convoluted history, other inferences could plausibly be drawn. The Court therefore declines Ms. Parris's request to discount this portion of Mr. Pappas's affidavit.

death in 2017.³  These references to the record are not enough to overcome the effect of Mr. Pappas's affidavit in generating a genuine dispute.  There is no evidence that Mr. Pappas, in fact, funded the Trust; there is only the inference described above.  When that inference collides with Mr. Pappas's statements, a dispute of material fact emerges.  The record reveals a genuine disagreement about whether Mr. Pappas funded the Trust, lied about it, and continues to lie about it to shield assets from creditors, or whether something more benign has transpired.  Mr. Galner may have funded the Trust as Mr. Pappas says.  Resolution of this issue could bar confirmation of Mr. Pappas's plan.  If he funded the Trust to shield assets from creditors, and continues that effort today, it would be nearly impossible to conclude that he is making a good faith effort to repay creditors to the best of his ability.  This issue must be resolved at trial, where Mr. Pappas can be subjected to cross-examination and his credibility can be gauged.

The record also reflects conflicting narratives about who started and later operated the wood-bundling business.  Mr. Pappas attests that he did not transfer the business to Ms. Webber.  Ms. Parris asserts that Mr. Pappas started the business and then transferred it to Ms. Webber to generate income that could not be captured by creditors.  To support this theory, she cites, among other things: (i) Ms. Farrington's son's testimony that Mr. Pappas had a wood-bundling business, (ii) a website archive showing that Mr. Pappas created a website for the business in November 2014 bearing his name, phone number, and email address, (iii) Ms. Webber's testimony that she started the wood-bundling business in 2015, (iv) Mr. Pappas's testimony that the phone number on the wood-bundling website continues to ring to his residence and forward to his cell-phone,

---

³ Ms. Parris might like the Court to believe that Mr. Pappas forged Mr. Galner's signature on the Trust Agreement after Ms. Webber signed it and that he also fabricated the date on the signature page of the Agreement to fit with a narrative minimizing his involvement with the Trust.  This theory finds no direct support in the record evidence specifically highlighted in Ms. Parris's statement of material facts.  Indirect support is likewise unavailing, as the required inferences would require speculation adverse to Mr. Pappas.  *See* Mulero-Rodríguez v. Ponte, Inc., 98 F.3d 670, 672 (1st Cir. 1996).

and (v) Ms. Webber's testimony that she and Mr. Pappas built the cabins for $60,000 apiece.[4] When all of this evidence is strung together, the Court would have to speculate that Mr. Pappas used the business to generate income that would be shielded from creditors. In this procedural posture, the Court cannot engage in such speculation. *See* Mulero-Rodríguez v. Ponte, Inc., 98 F.3d 670, 672 (1st Cir. 1996) (explaining that an inference is reasonable only if it can be derived from the evidence without resort to speculation). This issue must also be resolved at trial.

The record reveals that Mr. Pappas demonstrated a serious disregard of his obligations to creditors and the courts in Connecticut. Much of his evasive conduct took place years ago, in the civil action and the chapter 7 case in Connecticut, and some of that conduct is memorialized in the contempt order of October 2017. As the chapter 13 trustee observed at oral argument, the proximity between that contempt order and the chapter 13 filing may suggest that Mr. Pappas lacks good faith. Ms. Parris goes a step further, arguing that the Connecticut District Court's findings in that contempt order "conclusively establish that Mr. Pappas has been dishonest, that he has attempted to mislead the court, and that he has made misrepresentations." She contends that the October 2017 contempt order "should collaterally estop Mr. Pappas from establishing good faith in this proceeding." At oral argument, she also suggested that this Court should accord preclusive effect to that contempt order and conclude that Mr. Pappas must have the ability to pay her $800 per month as ordered, or at least $334 per month as he proposed in his motion to modify that order.

Ms. Parris's theory that the October 2017 contempt order establishes a baseline for Mr. Pappas's ability to pay her now falls short in two respects. First, the October 2017 contempt

---

[4] In her reply in support of summary judgment, Ms. Parris asserts that Ms. Webber testified that the wood-bundling business funded the construction of the cabins. Ms. Parris did not assert as much in her statement of material facts and did not specifically cite that testimony. As such, the assertion is not properly included in the summary judgment calculus. *See* D. Me. LR 56(f) ("The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts.")

order was not based on explicit findings about Mr. Pappas's ability to make payments toward the debt owed to Ms. Parris. Second, the temporal proximity between the contempt proceedings and the beginning of this case is not determinative of Mr. Pappas's current ability to pay his creditors under a chapter 13 plan. About six months before Mr. Pappas filed this chapter 13 case, the Connecticut District Court ordered Mr. Pappas to pay Ms. Parris $800 per month to purge his contempt of a prior order. Mr. Pappas then moved to modify that order, asking the court to reduce the required payments to $334 per month. In isolation, these facts imply that Mr. Pappas must have been able to pay Ms. Parris at least $334 per month and as much as $800 per month. But Ms. Parris fails to recognize that Mr. Pappas made the motion to modify in October 2017. He filed his chapter 13 plan in April 2018. Between those events, he obtained employment as a maintenance worker at a restaurant, possibly changing his monthly income. Ms. Parris would like the Court to infer that Mr. Pappas is intentionally underemployed, or that he is not accurately reporting his current income. But those inferences cannot be fairly made against Mr. Pappas on this summary judgment record because they would rely exclusively on findings made by the Connecticut District Court before this case began. The Court will not draw those inferences in the absence of some evidence that Mr. Pappas is *currently* operating within a lifestyle constructed to thwart his creditors.

As can readily be appreciated, Ms. Parris's theories focus primarily on Mr. Pappas's conduct before the filing of this chapter 13 case. In this context, however, that conduct is somewhat less telling than Ms. Parris believes.[5] Under the good faith analysis of 11 U.S.C. § 1325, "prepetition conduct is but one element in the debtor's total circumstances[.]" In re

---

[5] This conclusion does not, in any way, signal the Court's approval of Mr. Pappas's contemptuous behavior or the cavalier attitude he has employed in his dealings with the legal system. The summary judgment record reveals that Mr. Pappas previously engaged in litigation behaviors that run the gamut from questionable to contemptuous. But the outcome here cannot be driven solely by that prepetition conduct. An essential link must be established between that conduct and the impact it may have on Mr. Pappas's creditors in this case.

Hughes, 98 B.R. 784, 789 (Bankr. S.D. Ohio 1989) (quotation marks omitted). "As a result, courts should take into account the totality of the circumstances confronting a debtor, not simply his or her pre-plan conduct, when deciding whether or not to confirm a chapter 13 plan." Id. (quotation marks omitted). The proximity between the October 2017 contempt order and the petition date is not determinative when it comes to Mr. Pappas's good faith in this case. It is, after all, permissible to use the Bankruptcy Code to try for a fresh start "when subject to a real and substantial threat of economic harm." In re Verdunn, 160 B.R. 682, 688 (Bankr. M.D. Fla. 1993). Mr. Pappas's failure to make full and accurate disclosures in the Connecticut litigation deserves stern censure, but it does not conclusively establish that he also failed to make full and accurate disclosures in this chapter 13 case. Ultimately, his nondisclosures in the Connecticut litigation are only material to the good faith questions in this case to the extent that he has continued a practice of nondisclosure in this case. The question, then, is whether Mr. Pappas's historic practice of obfuscation has spilled over into more recent history, and somehow infected this bankruptcy case.

In her motion, Ms. Parris cites Marrama v. Citizens Bank of Massachusetts, 549 U.S. 365, 367 (2007), for the proposition that "the federal courts are virtually unanimous that prepetition bad-faith conduct may cause a forfeiture of any right to proceed with a Chapter 13 case." Marrama, however, did not hold that a bankruptcy court should deny confirmation of a chapter 13 plan upon any finding of pre-petition bad faith conduct, or should focus primarily on pre-petition conduct in evaluating the debtor's bona fides. Instead, the Supreme Court held that a chapter 7 debtor may forfeit the right to convert to chapter 13 under 11 U.S.C. § 706 by making false statements on his schedules to conceal assets from creditors. Id. at 368-71.

Ms. Parris asserts that Mr. Pappas's petition is "riddled with inaccuracies" and that he has "failed to accurately state his debt, expenses, income, and assets." At oral argument, when asked

to identify specific inaccuracies, Ms. Parris pointed only to Mr. Pappas's failure to disclose an interest in his residence under the land installment contract. The explanation that Mr. Pappas provided in response was not patently unreasonable; he apparently believed that, upon expiration of the option to purchase, he had become a tenant-at-will in the property, with no interest to disclose. The better path, and the one less suggestive of an attempt to mislead, would have been to disclose the potential interest, as Mr. Pappas's counsel conceded at oral argument. But, if Mr. Pappas had intended to conceal the existence of his home, reporting the $500 rental or home ownership expense on Schedule J would have been antithetical to that goal. On this summary judgment record, the Court will not infer that Mr. Pappas failed to identify an interest in his residence with the intent to mislead the Court and creditors. Because the record does not compel that determination as to Mr. Pappas's intent, the question must await an evidentiary hearing. *See* Wood v. Premier Capital, Inc. (In re Wood), 291 B.R. 219, 226 (B.A.P. 1st Cir. 2003) ("Intent to conceal is a factual determination to be made by the bankruptcy court based upon the evidence presented and inferences drawn therefrom at trial.").

The parties also disagree about whether Mr. Pappas has properly complied with his discovery obligations since the Court granted Ms. Parris's motion to compel. Ms. Parris asserts that Mr. Pappas has failed to produce tax documents for 2015, 2016, or 2017, copies of paystubs, copies of bills, and other documents supporting his responses to the questions asked on his schedules and SOFA. Mr. Pappas says that he has produced all tax returns that he was required to file and all documents that he possesses or is able to access. Ms. Parris suggests that Mr. Pappas failed to disclose all of his financial accounts and his expenses for electricity, cell phone, and cable. Mr. Pappas replies that he has opened utility accounts in his name for other people, and that they make payments on those accounts using their own financial accounts. These granular disagreements about discovery are not well-suited to resolution on summary judgment,

and do not fit neatly into the analysis of good faith. They do, however, tie into a larger picture of Mr. Pappas's diligence—or lack thereof—in his efforts to comply with his obligations to the legal system, and to Ms. Parris as a participant in that system.

In that vein, Ms. Parris contends that Mr. Pappas "has willfully evaded discovery" in this case. She is right about that to an extent; Mr. Pappas's failures have been observed and sanctioned by the Court on multiple occasions. On one hand, Mr. Pappas's recent failures to cooperate in discovery lend credence to Ms. Parris's theory that his history of stonewalling in litigation is part of an ongoing pattern that has carried over into this case. On the other hand, although discovery violations are serious, they should not necessarily be conflated with a debtor's bona fides in seeking bankruptcy protection. Discovery violations should, in the first instance, be addressed through the mechanisms provided in Fed. R. Civ. P. 37. Those mechanisms have, at all times, been available to Ms. Parris, and she made use of them in this case. She filed a motion to compel Mr. Pappas to produce documents, asking the Court to deny confirmation conditionally, pending the production of the documents. After a hearing, she and Mr. Pappas reached an agreement that did not include denial of confirmation as a conditional sanction. Later, when Ms. Parris sought sanctions due to Mr. Pappas's failure to comply with the order on the motion to compel, she did not ask the Court to deny confirmation as a sanction under Fed. R. Civ. P. 37(b)(2)(A), even though the Court had previously advised that such a request would be granted. Mr. Pappas's shortcomings in the discovery process are far from laudable, but they have been remediated to an extent. In short, Mr. Pappas's discovery failures are not so egregious as to tip the needle toward a summary judgment denying confirmation.

Although this case prominently features a continuation of the dispute between Mr. Pappas and Ms. Parris, the case is not only a continuation of that dispute. Mr. Pappas has other debts, including a sizeable tax debt that he may be able to discharge by successfully completing

his proposed plan.  As previously noted, there is a genuine dispute of fact as to whether the plan reflects Mr. Pappas's ability to pay creditors.  Whether he has some form of hidden interest in the Trust and its assets is unclear.  Whether the plan accurately reflects Mr. Pappas's ability to earn income through activities on Trust-related properties, like the wood-bundling business, is also unclear.  Although the proposed payout to unsecured creditors, including Ms. Parris, is minimal, the record does not establish that he could afford to pay more.

This summary judgment record reveals several disputes of material fact, and it is not evident that Ms. Parris is entitled to judgment as a matter of law.  Genuine issues of material fact exist as to whether Mr. Pappas actually funded the Trust, or otherwise concealed income or assets from his creditors, the trustee, or the Court.  In this procedural posture, the Court cannot choose between the parties' competing versions of the truth.

## IV. CONCLUSION

On this record, it is not apparent whether this chapter 13 case and Mr. Pappas's proposed plan is an attempt to thwart Ms. Parris or is instead a legitimate effort to secure a breathing spell, reorganize, discharge tax debt, and clear the field for payment of the debt to Ms. Parris going forward.  Good faith is "an amorphous notion, largely defined by factual inquiry."  In re Hughes, 98 B.R. at 791 (quotation marks omitted).  It "is, in part, a question of the [debtor's] motivation and sincerity in seeking Chapter 13 relief."  In re Guthrie, No. 05-82828, 2005 WL 3542664, at *1 (Bankr. C.D. Ill. Dec. 22, 2005).  A debtor's intent is a difficult thing to divine on summary judgment.  See Citifinancial Auto Corp. v. Price (In re Price), 366 B.R. 389, 398 (Bankr. M.D. Pa. 2007) ("Demonstration of good faith or lack thereof is a fact intensive inquiry and does not lend itself to decision on summary judgment.").  This material question, and the other questions left unresolved by this record, should be determined after trial.

For these reasons, Ms. Parris's motion for summary judgment is DENIED.

Dated:  September 19, 2019

Michael A. Fagone
United States Bankruptcy Judge
District of Maine